IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARNELL LEIGHTY, | ) | CASE NO. 5:14CV736 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Darnell Leighty ("Leighty") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Leighty protectively filed an application for Disability Insurance Benefits ("DIB") and SSI on September 21, 2010, alleging a disability onset date of January 1, 1990.  Tr. 22, 185, 187. He alleged disability based on the following: Osgood-Schlatter's disease;[1] arthritis and bone spurs in back; fibromyalgia; Epstein-Barr; chronic joint pain; depression; and anxiety.  Tr. 264. After denials by the state agency initially (Tr. 102, 114) and on reconsideration (Tr. 128, 140),

---

[1]  Osgood-Schlatter's disease is defined as an overuse injury with osteochondrosis of the tuberosity of the tibia and is seen most often in adolescent boys engaged in sports  that involve jumping. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 540.

Leighty requested an administrative hearing.  Tr. 158.  A hearing was held before Administrative Law Judge ("ALJ") Barbara Sheehe on October 18, 2012.  Tr. 42-78.  At the hearing, Leighty amended his onset date to September 21, 2010.  Tr. 45.  With the new onset date, Leighty was not entitled to DIB and he voluntarily withdrew that application.  Tr. 231.  In her October 26, 2012, decision (Tr. 22-35), the ALJ determined that there were jobs that existed in significant numbers in the national economy that Leighty could perform, i.e., he was not disabled.  Tr. 34. Leighty requested review of the ALJ's decision by the Appeals Council (Tr. 17) and, on February 5, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Leighty was born in 1975 and was 35 years old on the date his application was filed.  Tr. 259.  He completed a GED in 2008.  Tr. 265.  He previously worked as a cashier.  Tr. 265.

### B.  Medical Evidence

#### 1.  Physical evidence

On December 16, 2008, Leighty saw a doctor at the Cuyahoga Falls Hospital Primary Care and Specialty Center ("Care Center"), where he was a patient.[2]  Tr. 366; 368-370.  Leighty complained of pain in his shoulder, neck, and back, and Osgood-Schlatter disease in his legs.  Tr. 366.  X-rays of his lumbar spine, both knees, and right shoulder were normal.  Tr. 515.

On June 25, 2009, an x-ray of Leighty's thoracic spine disclosed minimal degenerative osteophyte formation.  Tr. 513.  An x-ray of his cervical spine was normal.  Tr. 514.

---

[2]  The name of the doctor he saw on this date is illegible.

On December 1, 2009, Heather Friedt, a certified physician's assistant, and Jim Bressi, D.O., from Falls Pain Management Center, co-signed a letter to Leighty's housing manager.  Tr. 338.  The letter explained that Leighty was being treated at Falls Chronic Pain Management for multiple joint pain and that Leighty has "significant issues" going up and down stairs because of knee pain.  Tr. 338.  The letter stated that Leighty would benefit from a first floor apartment.  Tr. 338.

On February 9, 2010, an MRI of Leighty's left knee showed a small joint effusion resulting in a finding of patellar chondromalacia.  Tr. 509.  An MRI of his right knee showed a small joint effusion and probable bone islands in the area of the lateral femoral condyle.  Tr. 512.

On March 15, 2010, Leighty, pursuant to a referral, saw rheumatologist James Goske, M.D., for widespread pain.  Tr. 345-46.  Leighty complained of pain below his knees, his elbows, back, and neck.  Tr. 345.  He stated that was unable to stand for more than a half an hour and that he could no longer walk far.  Tr. 345.  He also reported that his hands and forearms go numb.  Tr. 345.  He stated that he could no longer use a screwdriver or give his girlfriend a backrub without his hands "killing him the next day."  Tr. 345.  He stated that his back and neck pain started five years ago and that he has been putting up with all these pains for twenty years.  Tr. 345.  Dr. Goske diagnosed Leighty with arthralgia, myalgia, and other malaise and fatigue.[3]  Tr. 346.

On June 24, 2010, Leighty visited Dr. Bressi at Summit Pain Specialists for a routine follow-up.  Tr. 321-224.  Leighty rated his pain a six to nine out of ten and stated that his pain had moved up his back and that it was sharp and stabbing.  Tr. 322.   He denied side effects from his medication.  Tr. 322.  He ambulated without difficulty and appeared depressed.  Tr. 323.  Dr.

---

[3] Arthralgia is defined as joint pain.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 150.  Myalgia is defined as muscle pain.  *Id*. at 1214.

Bressi observed that he was positive for global body pain and weakness.  Tr. 322.  He noted that Leighty reported that his current pain medication regimen was not controlling his pain and expressed frustration because "no one can tell him why he hur[ts] so bad."  Tr. 323.  At the time, Leighty was taking Percocet; Dr. Bressi added Lyrica.  Tr. 323.

On July 7, 2010, an EMG study of Leighty's upper bilateral extremities was normal.  Tr. 502.  On July 15, 2010, Leighty saw Dr. Goske.  Tr. 349.  Dr. Goske reviewed Leighty's numerous test results, noting that they were in large part normal, and diagnosed the following: GERD, hyperlipidemia, Osgood-Schlatter disease, chronic pain syndrome, and fibromyalgia.  Tr. 349.  He noted that Leighty "strongly disagrees that his leg pains could be fibromyalgia" and that "he feels something is being missed."  Tr. 349.

On July 22, 2010, Leighty returned to the pain clinic and saw Guang Yang, M.D.  Tr. 325.  Leighty denied any adverse effects from his Lyrica.  Tr. 326.  He rated his pain level at a seven out of ten.  Tr. 326.  Dr. Yang described Leighty as well-nourished and well-appearing and noted that he ambulated without difficulty.  Tr. 326.  Upon examination, Leighty exhibited fourteen positive tender points out of a possible eighteen.  Tr. 326.  Dr. Yang told Leighty that anxiety and depression could be playing a role in his chronic fatigue and referred him to Portage Path Behavioral Health ("Portage Path") for counseling.  Tr. 326.

On October 19, 2010, Leighty returned to the Care Center to have a medical form filled out for unemployment benefits.  Tr. 354.  He saw Dr. Margocs.  Tr. 354.  He complained of symptoms from fatigue, myalgia, and arthralgia.  Tr. 354.  Dr. Margocs listed Leighty's depression and anxiety as improved.  Tr. 354.  The treatment note identifies two other diagnoses: dyslipidemia and fibromyalgia/chronic pain.  Tr. 354.

On February 21, 2012, Leighty saw Leroy LeFever, D.O., at the Care Center.  Tr. 390.
Dr. LeFever noted that Leighty was a patient with a longstanding history of fibromyalgia and
chronic low back pain who was referred to pain management last year but, due to insurance
issues, had not followed up.  Tr. 390.  He noted that Leighty wanted a referred to Dr. Bressi for
pain management.  Tr. 390.  Leighty reported that he was off his pain medications for about a
year because of financial issues.  Tr. 390.  He could afford his medication for his depression and
was doing well on it.  Tr. 390.  Dr. LeFever diagnosed mixed hyperlipidemia, fibromyalgia,
lumbago, other chronic pain, depressive disorder, and nondependent tobacco use disorder.  Tr.
390.

On April 24, 2012, Leighty saw Dr. Bressi.  Tr. 397.  Leighty complained of global body
pain made worse with walking, standing, lifting, bending, twisting, sitting and weather changes.
Tr. 398.  Leighty reported that his best success was with Lyrica and that, prior to leaving the
clinic because of insurance changes, he was to increase his Percocet.  Tr. 398.  Leighty stated
that these medications worked best because they caused no side effects and controlled his pain
well.  Tr. 398.  Upon examination, Dr. Bressi found over forty tender points that were consistent
with fibromyalgia.  Tr. 398.

On May 22, 2012, Leighty saw Dr. Yang.  Tr. 395.  Leighty reported that his current
medication regimen was working appropriately to control his pain and allowed him to engage in
his activities of daily living.  Tr. 395.  Dr. Yang observed that Leighty was in no acute pain and
ambulated without difficulty.  Leighty stated that he had not taken his medications that day
because he does not like to go places on an empty stomach.  Tr. 395.  He also stated that his
whole body was aching.  Tr. 395.  Dr. Yang noted that Leighty was positive for eighteen of
eighteen fibromyalgia tender points.  Tr. 395.

On August 14, 2012, Leighty returned to the pain clinic for a follow-up visit and saw a nurse practitioner, Laura Stith.  Tr. 468-470.  Leighty stated that his current pain treatment regime allowed him to engage in his activities of daily living and be more physically active.  Tr. 469.  He reported using a TENS machine that helped with his pain when his pain was not too intense.  Tr. 469.  Stith noted that Leighty did not appear to be in any acute pain and that he ambulated without difficulty.  Tr. 469.  She assessed him as positive for sixteen out of eighteen fibromyalgia tender points.  Tr. 469.

### 2.  Mental evidence

On September 20, 2011, Leighty filled out intake forms to receive mental health treatment at Portage Path.  Tr. 406.  He identified his chief complaint as depression/anxiety.  Tr. 406.  He reported that he has had depression since he was a teenager.  Tr. 406.  He has chronic fatigue and sleeps sixteen hours per day.  Tr. 406.  He has panic attacks that last five to ten minutes, during which time he has chest pain and feels faint.  Tr. 407.  He expressed no suicidal or homicidal ideation and did not report experiencing paranoia or hallucinations.  Tr. 416.  Tim Riley, a licensed counselor, rated Leighty's thought process as logical and his intelligence as average.  Tr. 416.  Riley described his memory as intact and his attention span sufficient.  Tr. 417.  Riley diagnosed Leighty with dysthymic disorder and assessed a Global Assessment of Functioning (GAF) score of 51.[4]  Tr. 418.

On October 19, 2011, Leighty saw Jill Lowery, a licensed counselor at Portage Path.  Tr. 437.  Leighty reported that he was unable to work because of his physical problems.  Tr. 437.

---

[4]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  Id.

He had been out of pain medication since February and would not return to pain management until January, at which time he can switch his insurance.  Tr. 437.

On December 19, 2011, Leighty saw Lowery again.  Tr. 434.  Lowery commented that Leighty had difficulty identifying goals and "seems to be here to justify his disability claim."  Tr. 435.  On February 15, 2012, Lowery again noted that Leighty was appealing his disability denial and is "here to justify his claim."  Tr. 430.  Leighty had not been consistent in keeping appointments, was not on medication, and did not "meet criteria for referral for prescriber services at that time."  Tr. 430.  Lowery observed that Leighty continued to report anxiety attacks that occurred for no reason and stated, "this is suspect as most panic attacks have triggers."  Tr. 430.  She commented that his treatment plan is minimal "due to his inability to identify what he is willing to do to get better."  Tr. 430.

On March 28, 2012, Leighty canceled his appointment.  Tr. 428.  Lowery observed that he canceled appointments at least 75% of the time and that he had little motivation to make changes in his life.  Tr. 428.  Lowery noted that Leighty had just re-started his pain management treatments.  Tr. 427.

### C.  Medical Opinion Evidence

### 1.  Dr. Bressi's letter

On September 13, 2010, Dr. Bressi and physician's assistant Heather Friedt co-signed a letter "to whom it may concern."  Tr. 339.  The letter stated that Leighty had been a part of their practice for two years.  Tr. 339.  It reported that Leighty was struggling with employment secondary to his multiple ailments and that he was diagnosed with fibromyalgia and chronic fatigue syndrome. Tr. 339.  Walking for longer than 10 minutes caused severe pain in Leighty's feet as well as a burning sensation and repetitive use of his upper extremities caused severe pain

and numbness in his hands. Tr. 339.  Bending, twisting and lifting also produced considerable pain.  Tr. 338.  The letter noted that Leighty took medications to deal with his pain and that the side effects of the medications caused drowsiness and decreased concentration.  Tr. 339.

### 2.  Consultative Examiners

On December 9, 2010, Leighty saw Joshua Magleby, Ph.D., for a psychological evaluation. Tr. 373-378.  Dr. Magleby noted that Leighty related his disability to physical problems, including knee pain, leg pain, and fatigue.  Tr. 373.  Leighty denied anxiety symptoms.  Tr. 375.  He stated that he has been depressed since he was eleven years old following the death of his grandmother and that his depression has worsened due to his physical ailments.  Tr. 374.

Upon examination, Leighty was "clearly alert" and oriented to person, pace, time, and situation.  Tr. 375.  His posture was normal and upright; his gait was normal and unencumbered. Tr. 375.  His thought content and affect were normal and his mood was stable.  Tr. 375. Psychomotor activity was normal and he displayed no overt signs of anxiety.  Tr. 376.  Dr. Magleby found that Leighty was independent in his activities of daily living without limitations or restrictions.  Tr. 376.

Dr. Magleby diagnosed Leighty with dysthymic disorder, anxiety disorder, and schizoid and borderline personality traits.  Tr. 377.  He assigned a GAF score of 60.  Tr. 377.  Dr. Magleby opined that Leighty's ability to understand, remember, and follow instructions and his ability to maintain attention, concentration, persistence and pace to perform simple, repetitive tasks was mildly impaired.  Tr. 377.  He found that Leighty's ability to relate to others, including fellow workers and supervisors, and his ability to withstand the stresses and pressures of day-to-day work activity was moderately impaired.  Tr. 378.

On February 16, 2012, A. Montuesla, M.D., completed a half-page medical source statement form with respect to Leighty's mental ability to perform work-related activities.  Tr. 404.  Dr. Montuesla opined that Leighty has extreme limitations in his ability to understand and remember instructions, to carry out complex instructions and to make judgments on complex work-related decisions.  Tr. 404.  Dr. Montuesla opined that Leighty has a marked impairment in his ability to carry out simple instructions, a moderate impairment in his ability to make judgments on simple work-related decisions, and a mild impairment in his ability to understand and remember simple instructions. Tr. 404.  Dr. Montuesla explained, "he is struggling with severe defects in memory and concentration from anxiety and depression.  Tr. 404.

### 3.  State Agency Reviewers

On December 18, 2010, David Brock, DO, a state agency physician, reviewed Leighty's file. Tr. 97-99.  Regarding Leighty's physical residual functional capacity (RFC), Dr. Brock opined that Leighty could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk and sit for a total of about six hours in an eight-hour workday; has an unlimited ability to push and pull; could occasionally climb ladders, ropes and scaffolds and crawl; could frequently climb ramps and stairs; and could frequently balance, stoop, kneel and crouch.  Tr. 99-99.

On April 11, 2011, state agency physician Gerald Klyop, M.D., reviewed Leighty's record and affirmed Dr. Brock's opinion.  Tr. 137.

On December 20, 2010, Tonnie Hoyle, Psy.D., a state agency psychologist, reviewed Leighty's file.  Tr. 95-96.  Regarding Leighty's mental RFC, Dr. Hoyle opined that Leighty was moderately limited in his ability to interact with the general public and to respond appropriately to changes in the work setting.  Tr. 99-100.  She commented that Leighty is capable of

performing repetitive tasks in an environment that requires only brief and superficial contact with others.  Tr. 100.

On August 15, 2011, state agency psychologist Irma Johnston, Psy.D., reviewed Leighty's record and affirmed Dr. Hoyle's limitation assessment, adding that Leighty is moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors.  Tr. 137-138.  Dr. Johnston commented that Leighty is capable of performing repetitive tasks in an environment where changes are infrequent and where there is only brief and superficial contact with others.  Tr. 138.

### D.  Testimonial Evidence

#### 1.  Leighty's Testimony

Leighty was represented by counsel and testified at the administrative hearing.  Tr. 46-69. He stated that he lives alone in a first-floor apartment.  Tr. 51.  He received a GED in 2008.  Tr. 47.  He previously worked as a cashier at a cigarette outlet store.  Tr. 48.  The most he lifted at that job was ten pounds, and in an eight-hour workday he spent about four hours sitting and four hours standing.  Tr. 48.

Leighty testified that has difficulty going up and down stairs because it causes the pain in his legs and back to get worse.  Tr. 52.  He cooks and cleans in his apartment but it takes him longer than he feels it should because he has to rest.  Tr. 52.  He testified that he sleeps "upwards between fourteen to sixteen hours" and that if he goes to bed at midnight he might wake up between 11:00 am and 1:00 pm.  Tr. 52.  Some days he has appointments that he goes to and other times he watches television or movies, listens to music, sits down and relaxes, or tries to clean something.  Tr. 54.  He does not drive because he cannot afford to.  Tr. 61.  He took a bus to the hearing.  Tr. 61.  He stated that he goes out about twice a week to appointments, the

grocery store, the dollar store, or the library, and that he walks or takes a bus.  Tr. 63-64.  He stated that these places are nearby.  Tr. 63.

Leighty testified that he changes position every ten minutes during the day because he is unable to find a comfortable position.  Tr. 54.  He can sit for half an hour before his legs start throbbing and stiffening and his back begins to hurt.  Tr. 54-55.  He can stand for half an hour. Tr. 55.  He estimated that he can walk two or two and a half city blocks before he would have to stop and take a rest.  Tr. 55-56.  He uses a cane, although he did not have it at the hearing because he "forgot" and had to "rush out of the apartment."  Tr. 62.  He has difficulty lifting items because of his back.  Tr. 56.  He also suffers from fatigue, which he described as feeling sluggish all the time, tired, wore down, and "just not wanting to move."  Tr. 59.  When he uses his hands for more than a few minutes at a time his hands start to go numb, pain shoots from the top of his hands and fingers, and then sets into his elbows.  Tr. 60.  He stated that it feels like someone is trying to rip his arm off.  Tr.  60.  He testified that it has been happening for years. Tr. 60.  He takes Percocet and Lyrica for his pain.  Tr. 48.

Leighty stated that he takes medication "usually" every day for his depression.  Tr. 56. He has a few extra good days when he takes his medication than he would otherwise have when he does not take his medication.  Tr. 56-57.  His medication has reduced the frequency of his crying spells.  Tr. 57.  He also experiences anxiety "once or twice every few weeks."  Tr. 58. His anxiety attacks hit him suddenly.  Tr. 58.  His face feels hot, his lower body feels as if it is on fire, he begins to sweat, his breath gets heavier, and he feels like he is going to pass out.  Tr. 58. He goes to Portage Path every two to three months for counseling.  Tr. 50.  He testified that he cancelled many of his sessions with his counselor because he gets sick a lot or is in so much pain

that he cannot move.  Tr. 63.  He does not get together with friends and the only family he sees is

his mother, who lives is the same housing complex.  Tr. 63.

### 2. Vocational Expert's Testimony

 Vocational Expert Thomas F. Nimberger ("VE") testified at the hearing.  Tr. 65-76.  The

ALJ discussed with the VE Leighty's past relevant work as a cashier at a cigarette outlet store.

Tr. 66-69.  The ALJ asked the VE to determine whether a hypothetical individual of Leighty's

age, education and work experience could perform the job he performed in the past if that person

had the following characteristics: can perform light work; can occasionally climb ladders, ropes,

scaffolds, stairs and ramps; can occasionally balance, stoop, kneel, crouch, and crawl; should

avoid all exposure to unprotected heights; has some mental limitations but is able to understand,

remember, and carry out simple, routine tasks that can be learned in thirty days or less; can

perform repetitive tasks such that the environment is relatively static; can perform low-stress

work, defined as precluding high production quotas such as piecework or assembly line work,

strict time requirements, arbitration, negotiation, confrontation, directing the work of others, or

being responsible for the safety of others; and can only have limited, superficial interaction with

coworkers and the public.  Tr. 69-70.  The VE testified that such a person would be unable to

perform Leighty's past relevant work.  Tr. 70.  The ALJ asked the VE if there were any jobs that

the individual could perform and the VE answered that the individual could perform jobs as a

packager (895 regional jobs, 88,000 national jobs), bakery worker (480 regional jobs, 72,000

national jobs), and mail clerk (680 regional jobs, 89,000 national jobs).  Tr. 70-71.

The ALJ asked the VE whether the same hypothetical individual could perform any jobs

if the individual was limited to performing sedentary work.  Tr. 71-72.  The VE answered that

such an individual could perform jobs as a polisher (410 regional jobs; 59,000 national jobs);

mailing house worker (390 regional jobs; 48,000 national jobs); and final assembly optical (340 local jobs; 32,000 national jobs).  Tr. 72.  The ALJ asked the VE whether the hypothetical individual could perform any jobs if the individual was limited to frequent, but not continual, handling and fingering.  Tr. 73.  The VE answered that such an individual could perform the three sedentary jobs indicated above and, of the light jobs indicated, the bakery worker and the mail clerk.  Tr. 73.

The ALJ then asked the VE whether the second hypothetical individual describe above could perform any jobs if the individual had the following additional limititation: the individual would require a sit/stand option, would change position once an hour, be working either seated or standing, and would be off task a minute or two while changing position.  Tr. 74.  The VE stated that the additional limitation would not change the previous answer with respect to jobs the individual could perform.  Tr. 74.  The ALJ asked the VE whether any of the hypothetical individuals described could perform any jobs if the individual would be off-task twenty percent of the time or more.  Tr. 74.  The VE answered that such an individual would be non-competitive and unable to perform any work.  Tr. 74.  The ALJ asked the VE whether any of the hypothetical individuals described could perform any jobs if the individual would miss two or more days of work per month.  Tr. 74.  The VE answered that there would be no work for an individual with that level of absenteeism.  Tr. 75.

Next, Leighty's attorney asked the VE whether the ALJ's second hypothetical individual (limited to sedentary jobs) could perform the jobs previously indicated by the VE, or any jobs, if the individual would be limited to occasional handling and fingering.  Tr. 75.  The VE answered that such an individual could not perform the jobs previously indicated or any jobs.  Tr. 75-76.  Leighty's attorney then asked the VE if, with respect to the limitation that the individual would

be off-task twenty percent of the time, the VE's answer would be the same if the question posed specified that the individual's production rate would be twenty percent less.  Tr. 76.  The VE stated that there were two ways to consider the question and two answers.  Tr. 76.  He observed that, on the one hand, there is a subtle difference between the two types of individuals described, and that he does not have a large enough database from his experience to answer the question. Tr. 76.  On the other hand, the VE stated, an individual that is twenty percent less productive is off-task twenty percent of the time because both percentages of the equation draw from the same one hundred percent.  Tr. 76.  If that were the case, the VE testified, there would be no work for such an individual.  Tr. 76.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

14

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her October 26, 2012, decision, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through September 30, 2009. Tr. 25.

2.     The claimant has not engaged in substantial gainful activity since September 26, 2010, the amended alleged onset date. Tr. 25.

3.     The claimant has the following severe impairments: fibromyalgia, arthralgia and myalgia, chronic fatigue syndrome, history of Epstein-Barr

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

syndrome, history of Osgood-Schlatter's disease, lumbago, obesity, dysthymic disorder, depressive disorder-not otherwise specified, and schizoid and borderline traits.  Tr. 25.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 26.

5.  The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant may occasionally balance, stoop, crouch, crawl, kneel and climb; the claimant must be afforded the option to sit or stand at least one time per hour, during which time he would be "off-task" for no more than two minutes while actually changing position; the claimant may frequently handle and finger with his bilateral upper extremities; the claimant may not be exposed to unprotected heights; the claimant is limited to the performance of tasks that are simple and routine, which can be learned in thirty days or less, that are repetitive, such that the environment remains relatively static, and that are low stress, defined as precluding tasks that involve high production quotas [such as piece-rate work or assembly line work], strict time requirements, arbitration, negotiation, confrontation, directing the work of, or being responsible for the safety of, others, and that require no more than limited and superficial interaction with co-workers and the public.  Tr. 28.

6.  The claimant is unable to perform any past relevant work.  Tr. 33.

7.  The claimant was born on January 16, 1975 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 33.

8.  The claimant has at least a high school education and is able to communicate in English.  Tr. 33.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 33.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 34.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 21, 2010, through the date of this decision.  Tr. 35.

## V. Parties' Arguments

Leighty objects to the ALJ's decision on two grounds.  He argues that the ALJ failed to follow the treating physician rule with respect to the opinion of his treating source Dr. Bressi.  Doc. 16, p. 12.  He also argues that the ALJ erred because she did not follow Social Security Rule 12-2p when evaluating Leighty's fibromyalgia.  Doc. 16, pp. 16-17.  In response, the Commissioner submits that the ALJ properly considered both the opinion evidence as well as Leighty's physical conditions.  Doc. 17, pp. 10-14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not err when considering Dr. Bressi's opinion

Leighty argues that the ALJ erred because she did not follow the treating source rule with respect to Dr. Bressi's opinion; that the ALJ failed to consider all of Dr. Bressi's opinions; the ALJ failed give good reasons for assigning weight to Dr. Bressi's opinion per 20 C.F.R. §

404.1527(c); and the ALJ's RFC assessment failed to include the limitations assessed by Dr. Bressi.  Doc. 16, pp. 12-16.

Leighty identifies two purported opinions submitted by Dr. Bressi: (1) the letter Dr. Bressi co-signed in December 2009 addressed to Leighty's housing manager stating that Leighty has "significant issues" going up and down stairs because of knee pain, and commenting that a first floor apartment would be "very beneficial" to him (Tr. 338); and (2) the letter Dr. Bressi co-signed in September 2010 addressed "to whom it may concern" stating that Leighty: has difficulty standing or sitting "for any period of time"; that walking more than ten minutes causes severe pain in his feet and a burning sensation; that repetitive use of his upper extremities causes severe pain and paresthesias; that he has chronic pain in his neck and lumbar area and that bending, twisting and lifting "reproduces considerable pain"; and that his pain medications cause side effects of drowsiness and decreased concentration (Doc. 339).  Doc. 16, p. 15.

### 1. Dr. Bressi is not a treating physician

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant. See 20 C.F.R. § 404.1502.  The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The treating

physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky v. Comm'r of Soc. Sec*., 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).  The plaintiff has the burden of showing that a doctor is a treating physician.  *See id*. at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four).  Before determining whether the ALJ complied with the treating source rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec*., 482 F.3d 873, 876 (6th Cir. 2007)).

Here, Leighty has failed to carry his burden of showing that Dr. Bressi is a treating physician.  There is only one treatment note in the record signed by Dr. Bressi prior to his September 2010 letter; that visit occurred in June 2010.  Tr. 322-324.  Leighty saw Dr. Bressi again in November 2010 (Tr. 400-401); the next visit occurred in April 2012.  Tr. 397-399. Although the September letter states that Leighty "has been a part of our practice for the last two years" (Tr. 339), it does not say that Dr. Bressi treated Leighty for two years and there is no evidence in the record that Leighty was treated by Dr. Bressi during that time.  Because Leighty has not shown that Dr. Bressi is a treating physician, Dr. Bressi's opinion is not entitled to controlling weight.  *See Kornecky*, 167 Fed. App'x at 506-508.

### 2.  The ALJ properly identified and discussed Dr. Bressi's opinion

Leighty argues that the ALJ "singled out only one of many of Dr. Bressi's opinions." Doc. 16, p. 13.  He identifies as a purported opinion the letter that Dr. Bressi wrote to Leighty's housing manager in December 2009 stating that Leighty would benefit from a first floor apartment because his knee pain makes it difficult for him to walk up and down stairs.  Doc. 16, p. 13, Tr. 338.  This is not an opinion and the ALJ was not, therefore, required to treat it as such. The only opinion Dr. Bressi submitted was his "to whom it may concern" letter dated September 13, 2010.

With respect to Dr. Bressi's opinion, the ALJ stated,

Little weight was accorded to the opinion of the claimant's pain management specialist, Jim Bressi, D.O., that the claimant cannot work, due to, among other reasons, multiple side effects of medications, including decreased concentration. Dr. Bressi has treated the claimant and was reporting within the bounds of his professional certifications; however, considerations of SSR 96-5p aside, his treatment notes consistently refer to the medications causing no side effects (1F/2,8), (7F/8), thereby eroding any confidence in the accuracy of his opinion.

Tr. 32.  Leighty argues that the ALJ's "discussion on that one opinion [regarding side effects of Leighty's medication] cannot serve as an excuse to ignore the rest of the Doctor's opinions." Doc. 16, p. 15.  The Court disagrees.  The ALJ recognized that there were other opinions contained in the letter, but pointed out that Dr. Bressi's assertion—that Leighty's medication caused drowsiness and decreased concentration—is patently unsupported by treatment notes regularly stating that Leighty suffers no side effects from his medication.  The ALJ reasonably explained that this statement by Dr. Bressi eroded *any* confidence in the accuracy of his opinion. Thus, it was reasonable for the ALJ to discount Dr. Bressi's opinion after having found a portion of it contrary to treatment notes expressly indicating that Leighty did not suffer from side effects.

Leighty contends that the ALJ considered only the fact that Leighty did not report medication side effects (when repeatedly asked whether he suffered any), but that Leighty's

statements are distinguishable from "statements by Dr. Bressi that no such side effects were, in fact occurring."  Doc. 16, p. 14.  Leighty does not cite evidence in the record demonstrating that Dr. Bressi suspected that Leighty was suffering from side effects.  Instead, Leighty simply asserts, "Dr. Bressi, as a pain management specialist, may have a better understanding of the side effects of medications than either Plaintiff's psychiatrist or than the Plaintiff himself, but the Judge never analyzes this."  Doc. 16, p.15.  Again, Leighty does not identify evidence the ALJ should have analyzed—the ALJ is not required to speculate as to what theoretical evidence potentially could have been submitted.

### 3.  The ALJ properly followed the regulations when considering Dr. Bressi's opinion and substantial evidence supports her RFC assessment

As described above, Dr. Bressi's opinion was not entitled to controlling weight.  Pursuant to 20 CFR § 404.1527(c), the Commissioner weighs medical opinion evidence that is not entitled to controlling weight based on the following: the examining relationship; the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors.

Here, the ALJ explained why she gave Dr. Bressi's opinion "little" weight.  She recognized that Dr. Bressi "was reporting within the bounds of his professional certifications" as a pain management specialist, but observed that Dr. Bressi's opinion was inconsistent with the record as a whole, including Dr. Bressi's own treatment notes.  Tr. 32.  The ALJ, elsewhere in her opinion, described Leighty's inconsistent statements suggesting that he was not entirely credible and that the mental and physical symptoms he described were not as severe as alleged.  Tr. 30-32.  She commented that, although Leighty's medical history was consistent with his allegations of chronic pain, the record, as a whole, did not support a finding that his impairments preclude all types of work.  Tr. 29, 30.  The ALJ described that the physical examinations in the

record consistently demonstrated normal or minimal results and that, although Leighty was tender to palpation on all his joints, he was able to ambulate without difficulty, had a functional range of motion, normal stability of all joints, normal motor strength in all extremities, normal reflexes, and no neurological deficits.  Tr. 30; *see also* Tr. 28.  She explained that his medication and treatment with a TENS machine was effective.  Tr. 30.  She found that Leighty's mental health treatment records showed objective findings that were not as severe as those alleged.  Tr. 30-31.  Leighty was able to perform daily activities that indicated he was not as limited as his complaints of disabling symptoms and limitations suggested.  Tr. 31.  With respect to Leighty's work history, the ALJ commented that Leighty stopped working for reasons unrelated to his medical conditions and that his counselor indicated he underwent mental health treatment to "justify his disability claim."  Tr. 31, 32.  Regarding Leighty's upper extremities, the ALJ observed that, despite reported numbness and tingling in his hands, Leighty submitted a lengthy handwritten disability report containing clear and consistent handwriting.  Tr. 32.

Finally, the ALJ noted that, although the state agency medical consultants opined that Leighty could perform light work and could frequently climb (Tr. 32), the ALJ limited Leighty to sedentary work and an ability to occasionally climb (Tr. 27).  The ALJ's RFC assessment similarly provided for greater limitations than the state agency psychologists recommended.  Tr. 32-33.

In sum, the ALJ complied with 20 CFR § 404.1527(c) when assigning weight to Dr. Bressi's opinion and substantial evidence supports her RFC assessment.  Accordingly, her decision is affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.).

**B.  The ALJ did not err when he considered Leighty's fibromyalgia**

Leighty argues that the ALJ erred in evaluating his fibromyalgia and complaints of chronic pain when assessing Leighty's credibility.  Doc. 16, p. 16.  He asserts that the ALJ did not follow SSR 12-2p because she erroneously relied on normal test results, and that this "is exactly the type of analysis that the Courts found to be error in *Swain* and *Rogers*."  Doc. 16, p. 17.  He also contends that the ALJ impermissibly focused on gaps in treatment records without considering whether such gaps were due to a lack of access, health insurance, and/or financial reasons.  Doc. 16, pp. 17-19.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 244, n.3 (6th Cir. 2007) (quoting Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)).  The Sixth Circuit has recognized that fibromyalgia can result in a disability. *See, e.g., Preston v. Sec'y of Health & Human Servs*., 854 F.2d 815, 818 (6th Cir. 1988). Nevertheless, fibromyalgia presents challenges in disability analyses because, "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."  *Rogers*, 486 F.3d at 243; *see also Swain v. Comm'r of Soc. Sec*., 297 F.Supp.2d 986, 990 (N.D. Ohio 2003) ("Fibromyalgia is an 'elusive' and 'mysterious' disease. It has no known cause and no known cure.").  In other words, objective medical evidence corroborating allegations of pain derived from fibromyalgia is often nonexistent. *See id.* In this regard, the Sixth Circuit has recognized that, for claims based upon fibromyalgia, the cause of the disability is not the underlying condition itself but, rather, the symptoms associated with the condition—including complaints of pain, stiffness, fatigue, and inability to concentrate. *Rogers*, 486 F.3d at 247.  Despite the unique nature of the impairment, however, a "diagnosis of

fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008), citing and quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("'Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [the claimant] is one of the minority.'")).

Here, the ALJ's analysis is not exactly like the ALJ's analysis in *Rogers*, as Leighty alleges. In *Rogers*, the ALJ erred when he found that the claimant's fibromyalgia was not a severe impairment. 486 F.3d at 243. The ALJ based his finding on a "hesitancy" to identify the condition. *Id*. Specifically, the ALJ in *Rogers* ignored the process for diagnosing fibromyalgia because he omitted testing for focal point tenderness and ruling out other conditions. *Id*. at 244; *see also Swain*, 297 F. Supp. 2d at 993 (the ALJ erred when he rejected a treating source opinion because the ALJ ignored that the claimant had positive tender points and focused only on normal test results). Here, the ALJ found Leighty's fibromyalgia to be a severe impairment. Tr. 25. She considered Leighty's positive trigger points and the lack of positive test results typical in fibromyalgia cases. Tr. 25, 29-30. *See also* SSR 12-2p, at *2-3 ("we *may* find" that a person has fibromyalgia if he or she has all three of the following: a history of widespread pain, at least eleven tender points; and evidence that other disorders that could cause the symptoms were excluded (emphasis added)).

Regarding the analysis an ALJ employs when considering fibromyalgia, the court in *Swain* observed,

> This places a premium, therefore, in such cases on the assessment of the claimant's credibility. Although the treating physician's assessment can provide substantial input into this credibility determination, ultimately, the ALJ must decide, given the factors set out in the regulations, if the claimant's pain is so severe as to impose limitations rendering her disabled. For purposes of judicial review, the ALJ's articulation of the reasons supporting his credibility findings becomes very important.

297 F.Supp.2d at 990.  The ALJ in this case, unlike the ALJ in *Swain*, did not base her decision

solely on the lack of positive test results.  Instead, the ALJ assessed Leighty's credibility; her

articulation of the reasons supporting her credibility finding were sufficient, as described in

greater detail above; and the ALJ ultimately found that, although Leighty has fibromyalgia and

experiences symptoms of that disease and other diseases, his pain is not so severe as to render

him disabled.  Tr. 29.  Specifically, the ALJ observed that Leighty's activities of daily living and

his effective response to prescription medications and the use of a TENS machine indicate that

he can perform work as described in the ALJ's RFC assessment.  Tr. 29-30.  Accordingly, the

ALJ's evaluation of Leighty's fibromyalgia was not erroneous.

Leighty also argues that the ALJ improperly focused on the gap in his pain treatment,

from November 2010 to April 2012, in finding that his pain complaints are not as severe as

alleged without considering the reasons for the gaps.  Doc. 16, pp. 18-19.  The ALJ observed that

Leighty did not seek treatment for pain management for over one year.  Tr. 29.  This observation,

alone, does not evince an improper focus on the part of the ALJ and, as described, the ALJ's

thorough decision considered many reasons when assessing Leighty's credibility.  The ALJ also

cited treatment notes during that one year period, indicating that Leighty was not entirely without

resources.  Tr. 29 (treatment note dated August 2011), 30-31 (treatment notes dated December

2010, September 2011).  Finally, the fact that Leighty did not seek pain treatment due to

"insurance issues" does not indicate that Leighty tried and could find no way to obtain treatment.

*See McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990) (discussing a Fifth Circuit opinion

involving a claimant who cannot afford prescribed medicine and can find "no way to obtain it.").

The ALJ's finding with respect to Leighty's fibromyalgia and her credibility assessment was not

erroneous and is, therefore, affirmed.

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: March 11, 2015

Kathleen B. Burke
United States Magistrate Judge